# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:25-cr-79 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| RICHARD ALLEN, SR. | ) | Magistrate Judge Dumitru |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant Richard Allen, Sr.'s Motion for Judgment of Acquittal or, in the Alternative, New Trial [Doc. 65]. For reasons that follow, the Motion [Doc. 65] will be **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Richard Allen, Sr., was charged in Counts One, Two, Three, and Four of the February 3, 2026, Second Superseding Indictment. [Doc. 30]. The specifics of these counts are as follows:

*Count One* charges that on or about August 15, 2024, Allen knowingly, intentionally, and without authority possessed with the intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

*Count Two* charges that on or about August 15, 2024, Allen knowingly possessed a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States (i.e., the charge identified in Count One), in violation of 18 U.S.C. § 924(c)(1)(A)(i).

*Count Three* charges that on or about August 15, 2024, Allen, knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm that was shipped and transported in and affected interstate

commerce, in violation of 18 U.S.C. § 922(g)(1).

And *Count Four* charges that on or about September 6, 2024, Allen knowingly, intentionally, and without authority possessed with the intent to distribute 5 grams or more of methamphetamine (actual), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

After a one-and-a-half-day trial from April 21 to 22, 2026, the jury found Allen guilty on all four counts. [Doc. 57].

### A. Counts One, Two, and Three

Starting with the conduct that gave rise to Counts One, Two, and Three, Officer Kyle Osburn of the Chattanooga Police Department testified that in early hours of August 15, 2024, he was conducting a foot patrol of the East Lake Courts public housing development when he approached what he termed "the gambling corner," an area of the development not covered by security cameras and known for illicit activity. [Doc. 63 at 13–15]. As Officer Osburn approached the gambling corner, he observed several individuals who, upon seeing Officer Osburn and the other officers with him, "immediately began to scramble and gather their belongings doing a 180 and walking in the opposite direction." [*Id.* at 17]. Officer Osburn testified that he and the other officers told these individuals to stop, but they did not comply, so the officers gave chase. [*Id.*].

Officer Osburn testified that he personally "chased after the closest of the individuals," including Allen. [*Id.*]. Officer Osburn further testified that as he chased these individuals, he "observed [Allen] fall on a porch and roll over[,]" and that as Allen rolled over, he "observed a Ruger LC9 9-millimeter handgun laid on the porch directly under [Allen] where [Allen] had fallen."[1] [*Id.*]. Upon seeing this firearm, Officer Osburn ordered Allen off the porch and detained

---

[1] At the time Officer Osburn initially observed this firearm, he did not identify its make and model. [Doc. 63 at 18]. Rather, this identification occurred later. [*Id.*].

2

him. [*Id.* at 17–18]. Officer Osburn testified he then handcuffed Allen behind his back using two sets of handcuffs linked together, a decision that was necessitated by Allen's broad-shouldered build. [*Id.* at 18–19]. Officer Osburn also testified that he did not search Allen at this time. [*Id.* at 19].

That said, Officer Osburn did testify that he searched Allen later that morning. [*Id.* at 20]. And he testified he found the following items on Allen's person: (1) over 53 grams "field weight"[2] of methamphetamine;[3] (2) more than $900 in cash; (3) a portable scale; (4) small, empty plastic baggies; and (5) small amounts of marijuana and crack cocaine. [*Id.* at 20, 27–28]. Officer Osburn further testified that in addition to these items found on Allen's person, Chattanooga Police also recovered the Ruger LC9 found on the porch,[4] as well as a Springfield XD-40 40-millimeter handgun found lying against a wall behind Allen.[5] [*Id.* at 20, 28].

Excerpts of Officer Osburn's body-worn camera footage from August 15, 2024—which were entered into evidence as the Government's Exhibit 4—generally corroborated Officer Osburn's testimony.[6] It showed Officer Osburn approach the gambling corner, how the individuals

---

[2] Officer Osburn stated that "[m]ore experienced field officers such as [himself]" commonly carry a scale to weigh narcotics. [Doc. 63 at 21]. When narcotics are weighed in this manner, the resulting figure is the narcotic's "field weight." [*See id.*].

[3] This methamphetamine was entered into evidence at trial as the Government's Exhibit 3. [Doc. 63 at 31–32]. Additionally, a photograph of this methamphetamine was entered into evidence as Exhibit 3-A. [*Id.*].

[4] This Ruger LC9 and accompanying ammunition were entered into evidence at trial as the Government's Exhibit 1. [Doc. 63 at 29–30]. Additionally, a photograph of the Ruger LC9 and accompanying ammunition was entered into evidence as Exhibit 1-A. [*Id.*].

[5] This Springfield XD-40 and accompanying ammunition were entered into evidence at trial as the Government's Exhibit 2. [Doc. 63 at 30–31]. Additionally, a photograph of the Springfield XD-40 and accompanying ammunition was entered into evidence as Exhibit 2-A. [*Id.*].

[6] The Government played Officer Osburn's body-worn camera footage during Officer Osburn's testimony, pausing it at points to ask Officer Osburn specific questions about what the video

3

present at the gambling corner began to disperse upon seeing law enforcement, and how these individuals ignored Officer Osburn's orders to stop, resulting in Officer Osburn giving chase. [Gov't Exh. 4]. It further showed that when Officer Osburn caught up to Allen, Allen was lying on a well-lit porch with the Ruger LC9 first underneath and then beside his right leg (and within arm's reach). [*Id.*]. From there, Officer Osburn's body-worn camera footage showed that Officer Osburn ordered Allen off the porch, directed Allen and the other individuals present to stay on the ground, and then handcuffed Allen behind his back without searching him. [*Id.*]. It showed Chattanooga Police secure the Ruger LC9 on the porch, and it showed Officer Osburn search Allen roughly 45 minutes after Allen was handcuffed and sat beside the porch stairs.[7] [*Id.*]. What Officer Osburn's body-worn camera did not show, however, was law enforcement recovering the Springfield XD-40.[8] [*See id.*].

Rather, the identification and recovery of the Springfield XD-40 was presented to the jury through separate body-worn camera footage and witness testimony. Officer Alayna Vaughn—also with the Chattanooga Police Department—testified that she arrived on scene after Allen and the other fleeing subjects were detained. [Doc. 63 at 59–60]. She testified she was there to serve as a backup officer, meaning she stood by while Officer Osburn conducted his investigation. [*Id.* at 60]. And like Officer Osburn, she was wearing a body-worn camera. [*Id.* at 60–61]. Officer Vaughn's testimony and body-worn camera footage—which was entered into evidence as the

---

depicted (e.g., "Q: Who is that you're getting off the porch? A: That's Mr. Richard Allen, sir.", "Q: You're pulling out your second set of handcuffs?", etc.). [*See* Doc. 63 at 22–25, 27–28].

[7] The time stamp on Officer Osburn's body-worn camera footage shows that Officer Osburn finished handcuffing Allen and sitting him up at approximately 03:07:17 and that he began searching Allen at approximately 03:51:48. [Gov't Exh. 4].

[8] Officer Osburn was not present when the Springfield XD-40 recovered as he was talking to other suspects at that time. [Doc. 63 at 52].

4

Government's Exhibit 7—told the same story.

Officer Vaughn was speaking with Officer Flahaut near Allen as Allen sat handcuffed by the porch stairs. [*Id.* at 61; Gov't Exh. 7]. As Officers Vaughn and Flahaut spoke, Officer Flahaut turned, walked towards Allen, shined his flashlight on him, and said he thought he heard something. [Doc. 63 at 61–62; Gov't Exh. 7]. But after a brief look, Flahaut chalked the noise up to nothing more than Allen's handcuffs and walked back over towards Officer Vaughn. [Gov't Exh. 7]. Roughly 20 minutes later, EMS arrived on scene to evaluate Allen.[9] [*Id.*]. As EMS personnel spoke with Allen, one of them noticed what was later identified as the Springfield XD-40 lying several feet behind Allen against a wall. [*Id.*]. EMS asked Officer Vaughn if Chattanooga Police knew about the firearm, and Officer Vaughn said they did, testifying she originally believed the Springfield XD-40 was the firearm Chattanooga Police had already identified (i.e., the Ruger LC9). [*See id.*; Doc. 63 at 62–63, 69]. But after talking to Officer White, another officer on the scene, and showing her the Springfield XD-40, Officer Vaughn realized the Springfield XD-40 was not the one Chattanooga Police had already recovered. [*See* Gov't Exh. 7; Doc. 63 at 63–64, 69; *see also* Gov't Exh. 6 (footage from Officer White's body-worn camera)].

In short, the Government presented the jury with evidence and testimony tending to show (i) that Allen ran from police on August 15, 2024; (ii) that when Allen was caught, he was lying on a well-lit porch on top of and then next to a Ruger LC9 handgun; (iii) that after Allen was detained (but before he was searched), a Springfield XD-40 handgun was found behind where he was sitting; and (iv) that a search of Allen's person revealed suspected controlled substances, scales, small plastic baggies, and more than $900 in cash. After the Government finished

---

[9] The time stamp on Officer Vaughn's body-worn camera footage shows Officer Flahaut walking back towards her after investigating the noise near Allen at approximately 03:15:10 and EMS personnel first speaking with Allen at approximately 03:35:10. [Gov't Exh. 7].

5

presenting this evidence and testimony, it then shifted its focus to (a) expert proof and (b) evidence and testimony concerning Allen's criminal history.

The Government offered the expert testimony Lauren McCormick, a forensic chemist at the Tennessee Bureau of Investigation's Knoxville Regional Crime Laboratory to establish (1) that the suspected methamphetamine seized from Allen on August 15, 2024, actually was methamphetamine and (2) that the mixture and substance containing methamphetamine weighed at least 50 grams. McCormick testified she tested the suspected methamphetamine (the Government's Exhibit 3) using both a chemical color test and infrared spectroscopy. [Doc. 64 at 7–9]. She testified that these tests confirmed the suspected methamphetamine did in fact contain methamphetamine, a conclusion that was memorialized in her written report. [*See id.* at 8–9; Gov't Exh. 12 (McCormick's "Official Forensic Chemistry Report")]. McCormick's written report further stated that the mixture and substance containing methamphetamine weighed 52.68 grams. [Gov't Exh. 12].

The Government further offered the expert testimony of Jared Olson, a Drug Enforcement Administration Special Agent, to establish that Allen possessed the mixture and substance containing methamphetamine with the intent to distribute it.[10] Olson testified that 52.68 grams of a mixture and substance containing methamphetamine is a distribution quantity whereas personal use quantities tend to be 1 to 3 grams. [Doc. 64 at 17–18]. Olson then testified that other indicia of drug distribution include the presence of scales, larger quantities of money, "[l]ittle baggies," and firearms, while indicia of personal drug use include "[p]ipes, foil," and "syringes," (i.e., "things that would be able to be used to use drugs"). [*Id.* at 18–19].

---

[10] Government also relied on Olson's testimony to establish that Allen possessed the methamphetamine described in Count Four with the intent to distribute it. Olson's testimony relating specifically to Court Four is discussed *infra* p. 10.

6

The Government also offered the expert testimony Chris Moon—a Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent and Interstate Nexus Examiner—to establish (1) that the Ruger LC9 and Springfield XD-40 are each considered "firearms," and (2) that these firearms traveled in interstate or foreign commerce. Moon testified that both the Ruger LC9 and the Springfield XD-40 fall within the federal definition of a "firearm" as each had been successfully test-fired by Chattanooga Police, meaning each of them expelled a projectile by action of an explosive.[11] [*See* Doc. 63 at 98–101]. Moon further testified that the Ruger LC9 was manufactured in Arizona and that the Springfield XD-40 was manufactured in Croatia, meaning both firearms had traveled in interstate or foreign commerce. [*Id.* at 99–101].

Finally, the Government offered the testimony of Joshua Henderson—a Probation Officer with the United States Probation Office—to establish that Allen was a convicted felon on August 15, 2024. Henderson testified the United States Probation Office for the Eastern District of Tennessee has supervised Allen in the past for three separate felony convictions, one for possession of heroin and two for being a felon in possession of a firearm. [Doc. 64 at 30–31]. To bolster this testimony and further establish that Allen was a convicted felon on August 15, 2024, the Government entered six different criminal judgments against Allen into the record: three relating to the felony convictions identified by Henderson and three others relating to felony convictions against Allen from the Tennessee state courts. [*Id.* at 31–35; Gov't Exhs. 14–19].[12]

---

[11] Following the close of proof, the Court instructed the jury on the law it was required to apply in this case, stating (among other things) that "[t]he term 'firearm' means any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."

[12] The Government's Exhibit 14 was a 1991 Tennessee state court judgment against Allen for possession of cocaine base (crack) for resale, a felony. [Gov't Exh. 14];

The Government's Exhibit 15 was a separate 1991 Tennessee state court judgment against Allen for possession of cocaine base (crack) for resale, a felony. [Gov't Exh. 15];

**B. Count Four**

Turning to the conduct giving rise to Count Four, Officer Osburn testified that he was conducting a directed patrol on September 6, 2024, when he again approached the gambling corner. [Doc. 63 at 34]. Officer Osburn testified that as he and other officers approached the gambling corner, the occupant of a vehicle alerted those at the gambling corner to the officers' presence. [*Id.*]. In response, these individuals—who Allen was among—attempted to scatter but were stopped by officers. [*Id.*]. Officer Osburn testified that as he and the other officers were identifying the individuals they had stopped and detained, it was pointed out to him that one of these individuals had thrown a baggie of what officers believed to be methamphetamine towards a tree. [*Id.*]. Officer Osburn testified he then went over and directed another officer to recover the baggie—which had a field weight of roughly 26 grams—while they ascertained who had thrown it. [*Id.*at 34–36]. Allen was arrested that day. Officer Osburn testified that officers found two 2.92 gram baggies of methamphetamine on Allen's person, one which resulted in his arrest and another which was found when he was booked into the Hamilton County Jail. [*Id.* at 38]. Officer Osburn further testified that prior to submitting his arrest report for Allen, he checked with Officer Kris Anderson whose body-worn camera footage revealed that it was Allen who threw the roughly 26

---

The Government's Exhibit 16 was a 1993 Tennessee state court judgment against Allen for reckless endangerment, a felony. [Gov't Exh. 16];

The Government's Exhibit 17 was a 1994 federal judgment against Allen for possessing a firearm as a convicted felon, a felony. [Gov't Exh. 17];

The Government's Exhibit 18 was a 2000 federal judgment against Allen for possession of heroin, a felony. [Gov't Exh. 18]; and

The Government's Exhibit 19 was a 2009 federal judgment against Allen for Allen for possessing a firearm as a convicted felon, a felony. [Gov't Exh. 19].

8

gram baggie of suspected methamphetamine. [*Id.*]. All three baggies of methamphetamine were entered into evidence as the Government's Exhibit 8 with a photo of the methamphetamine entered as Exhibit 8-A. Additionally, Officer Osburn's body-worn camera footage from September 6, 2024—which generally corroborated his testimony—was entered into evidence as the Government's Exhibit 9.

Then there was Officer Anderson's testimony. Officer Anderson testified that he and Officer Osburn were on foot patrol in East Lake Courts early on the morning of September 6, 2024, when they encountered Allen. [*Id.* at 76–77]. Officer Anderson testified that he and Officer Osburn detained Allen and several other individuals that morning as they tried to figure out what had been going on. [*Id.*]. None of these individuals were handcuffed at the time. [*Id.*].

Officer Anderson testified that as he was talking to one individual on his right, he "saw in the corner of [his] eye a hand go up as if something was being thrown" so he "immediately looked to [his] left and put [his] flashlight on something that could have been thrown." [*Id.* at 77]. Officer Anderson testified he then went over to where this object had been thrown and discovered it was a baggie with a "white powdery substance" inside. [*Id.* at 77–78]. Officer Anderson alerted Officer Osburn to this baggie, and officers on scene collected it. [*Id.* at 78].

Officer Anderson, like Officer Osburn, was wearing a body-worn camera on September 6, 2024. [*See id.*]. Excerpts from this camera's September 6, 2024, footage were entered into evidence as the Government's Exhibit 10. This footage—which Officer Anderson testified he watched in his patrol car on September 6, 2024—showed Allen reach into his right pocket with his right hand, pull out what was later identified as the baggie of roughly 26 grams of suspected methamphetamine, and throw the baggie towards a tree. [*See id.* at 80; Gov't Exh. 10].

To establish the suspected methamphetamine found on September 6, 2024, was actually

9

methamphetamine, the Government presented the expert testimony of Alan Randa, a senior forensic chemist at the Drug Enforcement Administration. Randa testified that he tested each of the three baggies of suspected methamphetamine and that, after confirming each baggie did in fact contain methamphetamine, he combined, ground, and sieved their contents so he could perform an infrared spectroscopy test and quantification.[13] [Doc. 63 at 90–91]. Randa testified that based on these tests, he concluded the methamphetamine recovered by Chattanooga Police on September 6, 2024, (i.e., the Government's Exhibit 8) contained 21.1 grams of 99% pure methamphetamine hydrochloride, which equates to 20.90 grams of pure methamphetamine. [*Id.* at 88], These findings were memorialized in Randa's written report, which was entered into evidence as the Government's Exhibit 13.

And to establish that Allen possessed this 20.90 grams of pure methamphetamine with the intent to distribute it, the Government again relied on the expert testimony of Jared Olson. Olson testified that, in addition to the indicators of drug distribution described *supra* p. 6, an individual having one large bag of methamphetamine and two smaller bags of methamphetamine would indicate that the individual intended to distribute the large bag. [Doc. 64 at 18].

*     *     *

After hearing the foregoing evidence and being instructed on the applicable law by the Court, the jury found Allen guilty of Counts One, Two, Three, and Four. [Doc. 57]. Now, Allen moves for a judgment of acquittal or, in the alternative, a new trial. [Doc. 65]. The Government has responded in opposition to Allen's motion, [Doc. 68], and Allen did not file a reply before the time to do so expired. Accordingly, the Motion [Doc. 65] is ripe for review.

---

[13] Randa testified he confirmed that each of the baggies contained methamphetamine using a sodium nitroprusside test and mass spectrometry test. [Doc. 63 at 91–92].

## II.  STANDARDS OF REVIEW

### A.  Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 allows a defendant to move for a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). Such a motion may be made either at the close of the Government's evidence, or "within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." FED. R. CRIM. P. 29(c)(1). In evaluating a Rule 29 motion, the Court does "not reweigh the evidence, reevaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). Rather, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Even circumstantial evidence may sustain a conviction so long as the totality of the evidence was substantial enough to establish guilt beyond a reasonable doubt." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002). "A defendant claiming insufficiency of the evidence bears a very heavy burden," *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (citation modified), and a judgment of acquittal is "confined to cases where the prosecution's failure is clear[,]" *United States v. Donaldson*, 52 F. App'x 700, 706 (6th Cir. 2002) (internal quotation marks omitted).

### B.  Motion for New Trial

Under Federal Rule of Criminal Procedure 33, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Unless the motion is based on newly discovered evidence, it must be filed "within 14 days after the verdict or finding of guilty." Rule 33(b)(2). "A motion for a new trial under Rule 33 . . . may be premised upon the

11

argument that the jury's verdict was against the manifest weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007). Yet such motions are generally granted "only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *Id.* (*quoting United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979)). In considering the weight of the evidence on a motion for a new trial, the district judge "may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *Id.* "[T]he defendant bears the burden of proof that a new trial is warranted and 'such motions should be granted sparingly and with caution.'" *United States v. Dolan*, 134 F.3d 372, *3 (6th Cir. 1997) (quoting *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993)).

## III. ANALYSIS

### A. Positions of the Parties

Allen's motion focuses on a singular issue: whether there was sufficient evidence to establish that he possessed a firearm on August 15, 2024, a necessary element of Counts Two and Three. [Doc. 65]. Allen contends there was not. He argues the only thing linking him to either the Ruger LC9 or the Springfield XD-40 was his proximity to both firearms when they were recovered, and such proximity, standing alone, is insufficient to establish that he possessed either firearm. [*See id.* at 4–7]. Regarding the Springfield XD-40, Allen further argues the Government's position that he could somehow conceal this firearm while being handcuffed and then later discard it undetected while cuffed and with officers nearby is absurd. [*Id.* at 5–6]. Accordingly, Allen argues that he is entitled to a judgment of acquittal or, at the very least, a new trial. [*See generally id.*].

The Government disagrees. Regarding the Ruger LC9, the Government asserts that body-worn camera footage shows not only that Allen was close to the Ruger LC9, but that Allen was lying on top of it. [Doc. 68 at 4–5]. The Government further argues that because the Ruger LC9

12

Case 1:25-cr-00079-CEA-MJD Document 70 Filed 08/05/26 Page 12 of 16
PageID #: 1477

was clearly visible on the porch, accepting that Allen did not possess the Ruger LC9 would also mean accepting that he purposefully dove on top of a random firearm. [*See id.* at 2, 5]. Thus, the Government argues, "[a] rational juror could certainly find that [Allen] placed the firearm there and, therefore, was in possession of it." [*Id.* at 5].

Regarding the Springfield XD-40, the Government again relies on body-worn camera footage. The Government asserts this footage shows there was no Springfield XD-40 against the wall prior to Allen being handcuffed and placed near the wall. [*See id.* at 2, 5]. But after Allen was sat down, police officers could be seen reacting to a sound, and then the Springfield XD-40 was discovered where no firearms had previously been located. [*See id.*]. Accordingly, the Government asserts, "[a] rational juror could find that [Allen] threw the firearm from his back waistband area even though he was handcuffed." [*Id.* at 5].

Finally, the Government argues that no new trial is warranted because "[t]he jury's verdict did not 'exceed the bounds of reasonableness.'" [*Id.* at 6].

After reviewing the record, the Court agrees with the Government on all fronts.

## B. Ruger LC9

Starting with the Ruger LC9, Allen is correct that proximity alone is insufficient to establish that he possessed a firearm. *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008). But as the Government notes, proximity alone is not all that links Allen to the Ruger LC9.

The jury saw Officer Osburn's body-worn camera footage from August 15, 2024. This footage shows Allen running from police and Officer Osburn giving chase. [Gov't Exh. 4]. It further shows Officer Osburn catch up to Allen and two other individuals at which point Allen is lying on a well-lit porch with the Ruger LC9 first under his right leg and then, as he turns, immediately beside him. [*Id.*]. The black body of the Ruger LC9 is clearly visible on the porch's

13

grey concrete. [*Id.*]. Under these circumstances, a rational juror could find that Allen possessed the Ruger LC9 beyond a reasonable doubt.

Prior to landing on the porch, Allen had been actively attempting to evade law enforcement and was carrying a distribution amount of a mixture and substance containing methamphetamine. A rational juror could infer that in these circumstances, Allen would not want to draw further attention to himself (and risk being searched) by being found in close proximity to a firearm. Thus, it would be unlikely that Allen would willingly run towards a random and clearly visible Ruger LC9 while he was being actively chased by police. Furthermore, a rational juror could have noted where the Ruger LC9 was located in relation to Allen's body. Not only was the Ruger LC9 first observed beneath Allen, but it was located on his right side near his waist and within arm's reach. It was not as if the firearm was found under Allen's shoulder or head. Rather it was found near where people commonly keep firearms, the waistline. Given this positioning, a rational juror could reasonably infer that Allen removed the Ruger LC9 from his waistband as he went down on the porch. Finally, a rational juror could rely on the fact that people do not commonly leave firearms lying on porches to bolster the inferences described above.

Of course, the Government's case would have been stronger had the Ruger LC9 been found on Allen's person. But even without this evidence, the Government's case was strong enough. Viewed in the light most favorable to the Government, a rational juror could have found that Allen possessed the Ruger LC9 when considering: (i) Allen's efforts to evade law enforcement prior to the firearm's discovery; (ii) Allen's incentives for not drawing attention to himself; (iii) the Ruger LC9's position on the porch relative to Allen; (iv) and the general absurdity of the idea that Allen would willingly run towards (and later fall on) a clearly visible random firearm whilst being chased by police. *See Campbell*, 549 F.3d at 374 (noting that "[o]ther incriminating evidence" can

14

"supplement a defendant's proximity to a firearm in order to tip the scales in favor of constructive possession"). Accordingly, Allen is not entitled to a judgment of acquittal based on his arguments relating to the Ruger LC9.

Additionally, this same evidence demonstrates that the jury's verdict was not against the manifest weight of the evidence. Accordingly, Allen is similarly not entitled to a new trial based on his arguments relating to the Ruger LC9.

### C. Springfield XD-40

Turning to the Springfield XD-40, the jury saw Officer Osburn's, Officer White's, and Officer Vaughn's body-worn camera footage from August 15, 2024. Each of these videos show, at one point or another, the wall where the Springfield XD-40 was ultimately found. [*See* Gov't Exhs. 4, 6, 7]. The videos show flashlights illuminating this wall on several occasions before Officer Flahaut walks over to Allen and says he heard something.[14] [*See* Gov't Exhs. 4, 6, 7]. In these moments, no firearm is visible against the wall. [*See* Gov't Exhs. 4, 6, 7]. But after Officer Flahaut says he heard something, EMS later discovers the Springfield XD-40 where no firearm had been before. [*See* Gov't Exh. 7].

The jury also heard Officer Osburn testify that he did not search Allen immediately after handcuffing him and saw body-worn camera footage reflecting this same version of events. [*See* Doc. 63 at 19; Gov't Exh. 4]. And the jury heard Officer Osburn testify that Allen would have still been able to throw the Springfield XD-40 against the wall notwithstanding the fact that he was

---

[14] Of these three videos, Officer Vaughn's is the most comprehensive as relates to the Springfield XD-40. It shows the relevant wall fully illuminated between time stamp 03:09.40 and 03:09:43. [Gov't Exh. 7]. There is no firearm against the wall at this time. [*Id.*]. The wall is similarly illuminated between time stamp 03:14:29 and 03:14:32, and yet again, there is no firearm. [*Id.*]. Officer Flahaut starts walking towards Allen at around time stamp 03:15:10, and EMS does not point out the Springfield XD-40 until around time stamp 03:35:36. [*Id.*].

15

handcuffed. [*See* Doc. 63 at 57–58].

Viewing this and the other evidence in the light most favorable to the Government, a rational juror could have found that Allen possessed the Springfield XD-40. More specifically, a rational juror could have concluded: (i) that Allen was carrying the Springfield XD-40 on his person when Officer Osburn handcuffed him; (ii) that Officer Osburn failed to notice the firearm as he did not search Allen; and (iii) Allen attempted to discard the Springfield XD-40 by throwing it against the wall while he sat handcuffed. Thus, Allen is not entitled to a judgment of acquittal based on his arguments relating to the Springfield XD-40.

And like with the Ruger LC9, this same evidence demonstrates that the jury's verdict was not against the manifest weight of the evidence. Accordingly, Allen is similarly not entitled to a new trial based on his arguments relating to the Springfield XD-40.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment of Acquittal or, in the Alternative, New Trial [Doc. 65] is **DENIED.**

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**

16